Fourth and final case of the day, case number 24-1807, Bennett v. Bayer. Counselor, if you exchange seats, you may proceed letting us know how much time you'd like to reserve for oral argument. You may proceed. Good morning, Your Honors, and may it please the Court. Caroline Tan for the government. We are not reserving rebuttal time. The District Court was wrong to limit fraudulent inducement claims brought under the False Claims Act to contracts. That conclusion is incompatible with this Court's decision in Petratos, which acknowledged fraud on FDA as a valid theory of liability and with the Federal Circuit's decision in Campy, which did the same. Since Hess, cases have recognized that payment claims predicated on an original fraud are actionable, regardless of the vehicle through which the payment is made. No case has ever turned on the existence of a contract. The government's request today is narrow. Reverse the District Court's erroneous conclusion that a contract is necessary. We take no position on the sufficiency of relator's complaint. I welcome the Court's questions. Was Petratos more of an implied false certification case rather than a fraudulent inducement case? Petratos controls the way you think about this case, Your Honor. I mean, I agree that it used the language of false certification, but these are merely different ways of conceptualizing the same framework, which is... Well, I think they might be different in the sense that implied false certification seems to be a legal falsity of claim theory, whereas fraudulent inducement seems to only kick in when claims are neither legally false nor factually false. No, Your Honor. I think that both theories are getting at the same thing, which is the claim that is predicated on an original fraud, whether that fraud happens at the inducement or at the performance of the action, carry over and contains essentially the claim for payment itself. So then that renders a claim legally false? It is false under the false claims against... False or fraudulent, yes. And I will say that Petratos recognized... You know, the facts of Petratos are on all fours with the facts of this case here, where there was an allegation of some sort of withholding of a serious side effect that would have... The theory was that it would have affected the way that FDA's approval or decision-making would have worked, which then would have affected the number of payments the government would have paid out as a result of that original fraud. If you look at the opinion in Petratos, it explains how FDA approval works. It explains how CMS reimbursement works. It essentially begins with the assumption that you can state a valid theory under the False Claims Act when that theory is based on fraud directed at the FDA. And so we think this case is controlling as far as, you know, the issue that we have participated in should be analyzed. If this court in Petratos thought that contracts were necessary or that it was any sense, then it wouldn't have gone through that analytical framework. It would have said, you know, no contract, no claim. But that's not what the court did. We recognize that it reached, you know, a result on materiality, but that only reaffirms the fact that it understood that this was a valid theory to begin with. And that's all we're trying to preserve in this case. I mean, you know, what do you make of... You know, there's some countervailing broad statements in this space, some of which say the False Claims Act is designed to remedy all fraud on the government. It's very, very, very broad. And then on the other side, it's like, no, the False Claims Act is not a panacea to catch everything. And so are you familiar with these kind of statements of breadth that kind of cut both ways at one level? They become less helpful the more that they have an equal and opposite kind of, you know, conjugate. You obviously would probably favor the view that, yeah, it's designed to remedy all fraud, but there's also counter statements that suggest, you know, not as much. You want to nuance that kind of how to balance those two? I think they're conflicting statements a little bit, but maybe I'm just not appreciating their context. I'm appreciating them as quotes of quotes of quotes. No, Your Honor, I appreciate the question. We're not, you know, we recognize these, you know, different sorts of language. We're not, we don't take the position that the False Claims Act is meant to remedy all fraud and sort of in the language that you have to identify. We recognize, like even our theory is simply saying that you should preserve this theory as a viable theory. We recognize that materiality, as this court said in Petratus, can be a high bar and all other elements under the False Claims Act would still apply under a theory like this. You'd have to show that the fraud directed at the government would have changed the government's decision. And that is going to be a limiting principle and a backstop to in a lot of cases where, you know, defendants would have raised this assumption that we are going to preserve these claims. It's not all that's happening here. We're merely asking you to preserve the claim so that when there is fraud that is significant enough and, you know, that the FDA would not have approved the device, it would not have approved a drug to enter the marketplace in the first place, the government still has a tool to recover against those serious forms of fraud. So you ask us, though, is amicus to reverse? And do we really have to go that far to preserve it? I mean, can't we just say, assuming arguendo, that this theory is actionable, we'd like to reach the falsity issue or the materiality issue or something else like that? I mean, it doesn't strike me that your request to preserve necessarily compels a reversal or a vacate remand. It just, it really what you're asking for is, as you just said, to preserve. So maybe we could say, you know what, courts do this all the time, you know. We're going to assume arguendo X and we're going to address the later issue Y. Would that be satisfactory to you as a path forward? So two responses, Your Honor. I mean, you're right that our primary objective here is to preserve that. We don't think that the district court's holding is consistent with that in as much as the holding said, you need a contract and it excluded what it termed regulatory interactions. So that's the part of the district court's opinion that we take issue with and we think is inconsistent with this court's decision in Petrados and a number of other courts that we've cited in our briefs. So if Petrados is the main source of your argument in terms of Third Circuit authority, but I think there's a reading of Petrados that just doesn't explicitly say, we're just assuming that this theory is viable, whether it's false certification or fraudulent inducement, Petrados just sets that up as background and ultimately it decides the case on materiality. So why is that? Why is any assumptions that it makes about the validity of the cause of action? Just dicta. Your Honor, two responses once again. I mean, the first is that Petrados controls the way you think about this case. It assumed that you could state a fraud and FDA claim, you know, irrespective of the existence or absence of a contract. And then it went on through the analytical framework to reach a decision on materiality. I mean, the second response, Your Honor, is that the Ninth Circuit in Canthia has already explicitly endorsed, you know, the fraudulent inducement sort of language in the context of these kinds of claims. We don't think these labels are analytically meaningful. We think that the ultimate point is that when there's fraud directed, when the fraud is directed in order to induce a payment, it doesn't matter which mechanism the payment comes through. The payment mechanism can be either a contract or it can be this regulatory program, but the underlying principle is the same. So, go ahead. Just touching on your semantics points, it seems to be that the government is doing most of the reading into the cause to be submitted fraudulent or false claim, whereas the reason these terms, fraudulent inducement, implied false certification, are putting all the work in the word fraud. So, I mean, is it really going to matter on the complaint, I guess, how they frame the claim, whether it be fraudulent or false in the theory, whether we even have to consider these common law theories of fraudulent inducement, et cetera? So, we've taken a position on the sufficiency of the claim, but if your question goes to... No, it's just a general question about which word is doing the work. And it seems to me the reason the fraudulent inducement and common law are being so scrutinized is because most of the work is being done in a complaint asserting a fraudulent claim rather than a false claim. And the government's theory seems to be more sort of, look, what really matters is was there a false statement in the claim and was whatever action causing that to be submitted? Yes, it's whether or not this lie would have changed the government's payment decision. In the NDA context, the new drug, you seem to be saying the way it has to change, it has to be either the approval or whether or not it's approved at all, or also the scope of the approval? It goes to that initial, the gatekeeper's initial decision. So, whether or not... So, if it would have changed the scope of the decision under the government's conception of this, is that a viable theory? If by scope of decision, you mean approval or disapproval? No, I mean, it's approved for condition X in population Y. And if we had known the truth, we would say it's only approved for condition X in population Y minus Z. That would be actionable. It's whether or not it changes the government's decision and it has to be connected to that ultimate claim for payment. So, when there are labeling changes, then the government pays out fewer claims because if the labeling is approved for fewer uses, then the government pays out fewer claims. And so, what matters really is the extent to which the lie changed the government's decision. In this case, the government or the FDA is the gatekeeper and that's how we're thinking about this particular line of analysis. So, I guess, I understand points. I just don't understand why we have to address this issue. You know, like if it's a negligence claim, you can always say, we're going to rule on causation and we aren't going to talk about duty and breach. You know, maybe there is no duty, maybe there's no breach, but there's countless negligent claims where courts jump right to kind of the causation issue. Toxic torts are kind of a classic example of that. And that doesn't concede or that doesn't mean that you should read that decision as saying, aha, because you addressed causation, you've got these others. It's kind of the difference between the multi-step test where if you're at step three, maybe it's safe to infer that you've done one and two versus an elemental test. And so, in my view, in order for this to be kind of necessary for us, it has to be kind of a step sort of thing as opposed to just a separate reason, a separate sufficient reason for rejecting the claim. I get that it's an important issue to preserve, but is it really necessary? If we want to move to a later issue, I think the court ruled on falsity as well. If we just want to rule on falsity, do we have to address this issue or what do you think? We think this case presents a great opportunity to address the issue. The district court reached a holding on it. All sides have briefed this specific question. We've had argument on this specific question. And clearly, there's confusion among the district courts as to how this claim, how this kind of claim should work. And so, we think the district court's holding was wrong. This case presents an ideal vehicle to reverse on those, to reverse that particular issue. And again, we take no position on the sufficiency of related complaints as to the other elements in this particular case. All right. Thank you. If the court has no further questions, I ask that you reverse that holding. Thank you. May it please the court. My name is Andrew Grosso. I represent Dr. Charles Bennett, the relator in this case. I would like to reserve two minutes from the rebuttal. I first would like to address materiality, causation, and falsity. The appellees rely heavily on Petratos against Genentech for the argument that making false statements, misrepresentations, withholding data is not material. There's a distinction, which the appellees actually notice, noted in their briefs, that in Petratos, the approval letter from the FDA was issued first. Thereafter, Genentech withheld the information they had concerning adverse events that it was compiling. And that, coupled with their marketing, caused physicians to prescribe Atavastazine for patients for whom it was not appropriate. It's different here. Here, the allegations are that the appellees submitted fraudulent information to the FDA, inducing it to issue, for all purposes, a blanket approval letter for their drugs. Thereafter, they marketed it to people who it was not appropriate for them to receive it. There was a precise change in the FDA's position in 2018. It changed the black box on its drugs. It carved out six psychiatric factors that it warned this might not be appropriate for certain categories of patients. That was induced by Dr. Bennett's 2014 letter. So I think we have materiality here. The FDA changed its position based on... It seems like the falsity you're asserting at the NDA stage is the disaggregation of data, which seems to depend on whether or not FQAD exists or matters. So, given that the FDA has declined to issue warnings about FQAD and specifically said that the labels were adequate to address comorbidities, why does the disaggregation matter? It matters because it reduces the awareness of the decision maker as to the significance of certain problems. But it has to matter in a sense that would affect payment. And if the FDA does not think FQAD matters for payment purposes, why is there materiality? Because there are certain categories of people, and that's recognized in this court's Genentech decision, that a certain drug, with its risk factors, is unreasonable for a patient to receive. Throughout the complaint, there's talk about psychiatric issues. If you have a patient who already has psychiatric issues, particularly certain issues, it would be unreasonable to give them a drug that is going to cause those particular issues. It will, looking for the right word, cause greater effect. So, you know, I'm really just stumbling on the falsity point. Like, I'll just tell you where I am and try to convince me. But, you know, your falsity rests in disaggregation, right? You say, hey, you should have combined these, and by not doing so, it was false. It doesn't say that any of the disaggregated data was false. It was just the fact that it was disaggregated is false. So that's a pretty bold propositional law. And as I read your briefs, and I'm focusing mostly on your blue brief at like pages, I think, 29 and 30, you give us three reasons for this. One, it's obvious, a plea to obviousness. Two, a citation to J.R.R. Wilkins, The Hobbit. And three, a reference to tax law that actually has a limit for what your reporting requirements have to be. It's actually an affirmative point of law that says you can't aggregate limits because we want to control laundering and gambling and all these other things. That's it. And so it strikes me that that's very little, a plea to obviousness, a reference to children's not present here, that's very ambitious to argue for such a bold proposition in this context. I'm not aware of someone asking for more with less. What do you say? I want to hear from you, but I've told you where I am. Well, the FDA relies on the companies to provide them with the information about the safety of their drugs. That is throughout the regulations. I think I've got two or three pages in my brief that cite those regulations. And we're talking about a particular cause for all of these psychiatric risks. But specifically for disaggregation is false. Just for that proposition. You're kind of blending, at least in my view, into materiality or something like this. But for the proposition that when you disaggregate, it is false. I mean, I didn't say anything else in your briefs. And that's not, that doesn't give me a lot of confidence to write a holding that says, you know what, if you disaggregate, even disaggregated it's true, it's one way of presenting data. Yeah, it might not be the most desirable or the best way of presenting data, but for certain people it may be really good for others. Is that false? Does that meet the falsity element? What do you say? You have anything else other than what you had in your blue brief? Two things. Yeah. First, it's deception. Because if I tell you I have three items I'm going to give you, but I don't tell you if I put them together, you're going to have a big problem. That's deception. But secondly, and I defer to a case out of a different circuit in the middle district of Florida, United States XRL Kosher, which is cited in my brief, against Constellation Technology. Something similar happened there. The data that was provided was actually correct. But it was listed in tables and charts in such a way that the significance was hidden. And the court there said this is deception and this can go forward. Now, so just put me on the arc of kind of legal principles that we here talked about in this space a little more. What are you saying? Are you saying that deception is tantamount to a material omission? Like in terms of, or is it just a strict factual thing? Some disaggregations will be deceptive, some won't. It would be helpful if there was a rule from like the FDA or something that said, these are the sort of symptoms that can be aggregated, these are the ones that can't. Guidance there obviously really helps set the bar for what's false and what's not. But in the absence of that, in the absence of a rule or a standard to go by, I don't know that we can just stand on the principle and say disaggregation on its own is per se, even is per se false. I think that is a factual question as to whether or not the FDA could have been deceived and was deceived. The allegation itself is sufficient. There was an attempt to make it to hide the significance of the problem. And it worked. Because once the FDA realized the significance of the problem, it amended its black box ruling. So I believe we have materiality established. We'll have 15 seconds, not soon enough to start something. Are there any questions from the bench? I think we're good. We'll hear from you on rebuttal. Thank you very much, Your Honor. Thank you. Thank you, Your Honor. Alon Ketem on behalf of Bayer Corporation. May it please the Court. The False Claims Act applies only to a false or fraudulent claim for payment. But Relator doesn't allege that payment claims for Bayer's drug Cipro were false or misleading in any respect. Instead, Relator's theory is that every reimbursement for these drugs was a False Claims Act violation because 40 years earlier, Bayer induced FDA to approve its drug by withholding material, although entirely unstated, information. That theory, which no court of appeals has accepted, is divorced from the text of the False Claims Act, from the common law of fraud, and from common sense. But Relator's complaint fails for more mundane reasons as well. Relator concedes, in fact he alleges, that FDA has long been aware of all of the information that he says Bayer concealed, yet has never withdrawn approval for the drug. Nor does he allege that CMS has ever declined to reimburse for the drug on the basis of his supposed revelations. And even if his allegations were material, they are the epitome of conclusory. Relator does not allege a single word that Bayer said to FDA, either in its new drug application in 1985, or in adverse event reports that were submitted at unspecified times over the following decades. Those allegations would not satisfy Rule 12, much less the heightened particularity requirement of Rule 9. So if he were asserting, I mean there's a lot of labeling here. So if he were asserting an implied false certification theory, where he said, you know what, if Bayer had aggregated their data, this would have been approved for a much more circumscribed population. Therefore, it's not that every claim is false, but those outside, those who've dropped out, given the correct information. Whether or not, well, would you call that fraudulent inducement? Or would you only call fraudulent inducement when a claim is both legally and factually true? So thank you for asking, because I think the distinction, contrary to my friend from the government, is actually quite important. With an implied false certification claim of the sort that was at issue in Petrados or in Escobar, there is a certification being made to the government in connection to the claim for payment. And let me just read for you a sentence from the first paragraph of Petrados. He, meaning the relator, alleged that Genentech suppressed data that caused doctors to certify incorrectly that Avastin was reasonable and necessary for certain at-risk Medicare patients. And so there is, in fact, a false statement, a statement that is false, if not literally, at least impliedly. Here, by contrast, there is no allegation that the statements made by doctors that this was reasonable and appropriate were false, even impliedly. They made no certification with respect to the fact that the drug was approved appropriately in the first place. And that, I think, is a key distinction, because the Supreme Court has made very clear there needs to be a false or fraudulent claim for payment. So there has to be a statement that is itself false in connection with the claim for payment. There are a lot of sort of falsities alleged in the complaint, as well as reliance. But I think if you were to read it generously, let's say, you could say it's asserting, one of its many theories, is that it's asserting that in the same way some doctors prescribe these drugs to patients who shouldn't have gotten them as reasonably and medically necessary. I know those words don't appear in the complaint. I'm just asking more so we can discuss the principle. I apologize. I'm just trying to understand, in your estimation, that's not a fraudulent inducement claim. Because a fraudulent inducement claim doesn't contemplate the legal or factual falsity, I don't know why I'm reverberating, of a claim. But rather, by fiat, just says that doesn't really matter whether it's legally or factually false. Just everything is because of the initial act, the initial falsity. That's correct. It's an original sin that means literally every follow-up claim for payment. But Relator actually had a fraudulent inducement, a false certification claim in his First Amendment complaint. It was dismissed by the district court. He did not reassert it in the Second Amendment complaint. So I think that hopefully answers your concerns about that. His allegation has a stunning breadth. It's the idea that if the original NDA was approved on the basis of false or fraudulent statements, every single claim as a result of that is false or fraudulent. In fact, it is a False Claims Act violation, which would effectively push these drugs off the market, notwithstanding the fact that FDA itself approved the drugs, has never withdrawn the drugs, and CMS continues to say that they are reasonable and necessary as doctors are prescribing them now. And there's a lot of concern, obviously, about the self-appointed Relator second-guessing decisions made by governmental agencies and, with the help of a jury, effectively overturning them. If the Court has no further questions about fraudulent inducement, perhaps I can speak, Judge Phipps, to some of your questions about falsity. So, first of all, with respect to falsity, essentially Relator is alleging that because data was provided to the government on a more granular level, that that somehow turns it into a misstatement. First of all, we're not aware of any real authority for that proposition. But, second of all, all that they're saying is that different symptoms were provided in a disaggregated form. So, instead of saying psychiatric disorders have a 5%—I'm just making up the numbers now— psychiatric disorders have a 5% prevalence, it says insomnia has a 0.3% prevalence, and headaches have a 0.4% prevalence, and so on. But, presumably, FDA can add up those numbers exactly as Relator did. More than—please. I mean, it strikes me that the greater risk of misrepresentation comes from aggregation, not disaggregation. If you have a drug that has, like, a 9% suicide rate, and then it has a bunch of other things, nightmares, anxiety, depression, for coupling together with 10%, and then you say, we have a 10% chance of nightmares, depression, anxiety, and suicide, that's a little misleading, because it almost soft-sells or under-represents the possibility of suicide. But aggregation strikes me as where the deception is, not in disaggregation. I'm piling on to your point a little bit, but, I mean, is this something that can be a rule of law, or that disaggregation is not false, or is this something that is case-by-case based on facts? So, I suppose it could be case-by-case, but I think in an instance where there's no allegation that this data was buried under reams and reams of paper, you might have a situation where you take the data and you sort of scatter it to the four ends of the earth, such that the agency can't find it. There's no allegation of that sort here. It's just simply disaggregation. It was there, it was presented, everyone knew where it was, it wasn't hidden, it was just in pieces. That's right. At least that's the allegation. Relator doesn't actually claim to have seen the new drug application or the adverse event reports. He's not saying, here is the words that Bayer said, and here's why they're false. He's just inferring from what he reads of the Levaquin label, that because the data was disaggregated on this FDA-approved label, therefore it must be that these manufacturers years earlier also presented the data in a disaggregated form. It struck me that your friend on the other side's strongest point was disaggregation is a problem when the whole is greater than the sum of its parts, where all of a sudden you've broken it down, but you realize if you put these two together, it gets bigger. Do you think that's the case here, and what do you think of that contention, and I guess is the case here? So again, putting aside a situation where the relevant information gets buried under a mound of other data, you would think that agencies getting more granular, more information is a better situation, because they can evaluate whether there are in fact aggregations that are appropriate. For instance, my friend talks about FQAD as a diagnosis. FDA decided that that wasn't an appropriate diagnosis. It wouldn't be helpful for doctors to see that as a diagnosis. And so it should be up to FDA to decide how to aggregate them, if at all. The only way they can do that is if they have disaggregated information. So last question from me, I don't want to dominate the time here, is if FDA issued a rule on aggregation and said these symptoms should be aggregated, these shouldn't be aggregated, obviously then a decision to aggregate or disaggregate would be false because there was greater guidance there. You're with me on that or not? It would at the very least, I think, arguably be false. Because you were certifying compliance with the FDA requirements. And say you'll aggregate these psychiatric side effects together, or you won't aggregate these, and then you start finding yourself in trouble. I think that's an easier case because in the material omission space, usually there's a duty. As Judge Phipps pointed out earlier, this seems to just be a sort of duty not to mislead, which is hard to pin down. So I recognize that it could in general be hard to pin down. Here, though, we have a lot of evidence about whether FDA thought that this information in aggregated form would make a difference. Obviously they got everything that Relator says was material in and around 2014 with the citizen petitions. They've never withdrawn the drug. They've also, CMS continues to pay for the drug. There's never an allegation that in any particular instance, CMS has said, this drug has not been necessary and appropriate for a particular patient. Okay. Thank you very much. Thank you, Your Honor. May it please the Court. Mark Mosher on behalf of Johnson & Johnson. I'd like to start by talking about Petranos. I had the benefit of arguing Petranos, and so I think it's striking to hear some of the ways that the case has been described. I think Judge Hardiman, the second sentence of the decision, got exactly right what the Petranos Relator argued, which is that he alleged that Genentech suppressed data that caused doctors to certify incorrectly that Avastin was reasonable and necessary for certain Medicare patients. So it was misrepresentations directed at the physician. When the physician submitted specific claims to CMS, it's alleged that the statements that those particular claims were false because they certified that the prescription was reasonable and necessary when but for the alleged fraud, they wouldn't have been reasonable and necessary. That's a very straightforward false certification theory. Particular claims by particular doctors submitted to CMS that were false. The fraudulent inducement theory, the Court explained this and recognized this in the Thomas decision, is a very different theory that applies when there's no allegation that anything about the claim submitted to CMS or submitted for payment is false. It is a theory that says in the absence of anything false about the claim, you can still proceed under the False Claims Act when you allege, then what it said in Thomas was that there was fraud that induced the government to enter into the contract and then claims were submitted pursuant to that contract. That's what's being alleged here. That's very different than what was alleged in Petranos, and it's a very different theory. We want to stick with Petranos. What happened in Petranos is that the District Court dismissed the complaint for failure to plead falsity. As the Court's mentioned a couple times today, what the panel here in the Third Circuit ultimately affirmed on was materiality, and we think the Court's materiality holding in Petranos should be viewed as controlling here because what the Court said is we look at materiality from the standpoint of CMS and would the alleged misrepresentations had changed CMS's decision to pay these claims. And in Petranos, the Court noted that there was no allegation. That was in an applied false certification case. So for fraudulent inducement, who would be the deceived? It seems like it would be the FDA. I think it's both, and I think that's why we brief. I think there's both causation and materiality comes into play. Ultimately, for purposes of establishing liability under the False Claims Act, you need to establish that CMS, that the government wouldn't have paid the claim. One way that there wouldn't have ultimately been any payment by the government is if FDA withdrew the drug from the market, then you would expect CMS to stop paying for that. You could have the case, though, where even if FDA, like it did here, left a drug on the market, CMS has regulatory and statutory authority to limit the circumstances in which it will reimburse for claims. So CMS could take the step of issuing a national coverage determination and say we will reimburse for a particular drug in these circumstances and not in others. There's no allegation that that happened here. There's no allegation that when the government learned of the alleged fraud, which paragraph 104 of the Second Amendment complaint says that the government, the FDA experts became fully aware of the extent of the side effects of FQs. It didn't remove them from the market. And there's no allegation that CMS changed its decisions. It stopped paying, has rejected paying any claim. And that's what the court said in Petratos would preclude a finding of materiality. If the alleged fraud is revealed to the government, but CMS keeps paying claims the way they would before. Can you address, though, removing it back to the NDA stage? I think earlier you had said, well, if the FDA removes a drug from the market, obviously that nullifies any claims for that drug as to CMS. So addressing the government's point that there is a version of this theory that should remain, why does the fact of a contract matter for this theory? Isn't it really whether the decision-making changes? The reason I ask that is it seems the significance of a contract is that the parties aren't bound to each other in the absence of the contract. No one has to perform absent the contract. But with an NDA approval, there are many things that the government will perform as a consequence of that. So why does it matter if there's a contract? So I think it matters for a contract based on the common law. If we step back to the text of the statute, the text of the statute says that the claim itself has to be false or fraudulent. The False Claims Act imposed liability for false and fraudulent claims. What this court has said, relying on the Supreme Court's decision in Hess, is that the false and fraudulent claim incorporates the common law doctrine of fraudulent inducement. That doctrine developed at common law as a species of fraud that addresses fraudulently induced contracts. And so what our position is, is that if the court has taken the first step of saying, we're going to incorporate into the statute a common law doctrine, our position is that that brings with it the common law limitations on that doctrine. You know, this notion of importing from the common law, like before I really kind of looked at this case, like I just, if you said, what is the common law of fraudulent inducement? I wouldn't have said you have to have a contract. I would have said, and this is just, you know, law school learning, studying for the bar learning. I would have said the element is justifiable reliance. That's what I would have said. And so, and now for the first time I'm hearing, no, no, no, no. What I thought I knew was dead wrong. It's, is there a contract? I thought it was justifiable reliance. Now, as I begin to, now, I mean, a lot of people have kind of in this context omitted any reference to justifiable reliance. But if we tease that out, maybe that can be reconciled because evidence of a contract suffices for justifiable reliance. And so in the absence of a contract or maybe the asterisk, another form of justifiable reliance, and I hope I'm not adding to the case law because the case law doesn't say that, but that strikes me is most consistent with the common law because I don't know that I've seen a common law case outside of the importation of common law principles into the FCA that has said you have to have a contract for there to be fraud. The concept I'm familiar with is justifiable reliance. You know this area a lot better than I do. What do you think? So the justifiable reliance we learned in law school, I think, is the common law general tort of fraud. And what I think we're talking about is a species of fraud, like the cases that we said in our brief talk about, that develops as an adjunct to contract law for the situation in which you enter into a contract with somebody. And the person you enter into then says you have obligations under that contract to pay me a certain amount of money, and you want to get out of that obligation by effectively nullifying the contract by saying, I only entered into the contract because you induced me through fraud. And so fraudulent inducement is a subset of fraud that is always focused on the contract. We saw it in our— Statement that doesn't go to the benefit of the bargain. So for instance, it's maybe not the price or the quantity, but I entered into it because I thought you— I mean, again, something that—isn't it more false statements that don't go to the benefit of the bargain? It's treated through like a but-for causation requirement, and this is what the D.C. Circuit was analyzing in the Seminoe decision in the context of fraudulent inducement. What you have to allege is I wouldn't have entered into the contract if I had known the true state of affairs. So the misrepresentation caused me to enter into a contract that I wouldn't have otherwise entered into. And so if we want that same— Similar line of cases like Taklov where they say that door opening isn't actionable fraud, but if it goes to the benefit of the bargain, it is. And that court just said that Taklov does not stand for the proposition that fraudulent inducement is not actionable under wire fraud. Now, that's a different statute. But it's—we're all talking about the same thing. Like what is—what does the falsity have to be about in this theory? So starting with the statute, the falsity has to be about the claim. But if we're moving back to the common law of fraudulent inducement, the fraud—the statement that is alleged to be fraudulent, it doesn't necessarily have to be limited to a particular topic, but you have to be able to establish that but for the fraud you wouldn't have entered into the contract. Can I just tease out again on the common law? In my understanding of common law, just correct everything I learned in law school if you need to, right? But as I understood fraud in common law, it manifested in two places, one of which was the tort of fraud, and the other was the defense in contract law to fraud. You could say, hey, don't enforce this contract on me. It was fraud. And so it seems to me that if we look to the common law of fraud as defense to a contract, then of course the prerequisite is that there has to be a contract because it's a defense to contract. But if we switch over and we look to the common law of tort for fraud, which might be a little bit more appropriate in this case because there is an affirmative action to seek tort recovery, the better source of common law would be the common law in the tort space, not the common law in the contract space. And if I can put a little, you know, thumb on the scale, it strikes me that the common law you want to use to defeat the tort claim is the common law developed in the contract space, not the common law in the tort space. But you've got Supreme Court cases that someone might have already won that battle for you. What do you say? So I think as an initial matter, a first step, the common law, the general common law of tort fraud is what is looked to under the False Claims Act. But remember, we are now in a situation that we are, there is no allegation that the claim itself, which the statute focuses on, is false or fraudulent. What courts have read into the False Claims Act and gone, we would say, gone beyond the text. The D.C. Circuit has described it as a gloss on the text. Is this doctrine from contract law about fraudulent inducement? And that's how they've described it. You know, I do think the, you know, the portion of Thomas I read talks about it in terms of contract. The Hess decision from the Supreme Court talks about it very clearly in terms of contract. And the common law of fraudulent inducement is one tied to contract. I'm seeing I'm out of time. If I could say one, make one point about the aggregation disaggregation point. I'm not going to add anything on the conceptual debate over what's misleading or not. But I do want to point to the fact that the record here and the allegations here, it's paragraph 62 of the second amended complaint. This is where it says that it was misleading or false, did not provide aggregated data. It provides a chart showing what the percentages would have been when it was aggregated. That data is in the record, in the data, in the information that FDA had before it when it approved this drug. So there is not even an allegation that this aggregated data wasn't before FDA at the time they approved the drug. So I think that's another reason, another problem with the theory of trying to base falsity on aggregated versus disaggregated data. Thank you. Thank you very much. Thank you, Your Honors. With regard to what was before the FDA, the FDA approval package, at least specific excerpts, are included in the appendix, pages 344 through 470. And yes, the FDA did have some specific information concerning psychotic risks, specifically headache, dizziness, and insomnia. That was it. Dr. Boxwell, in 2013, found six more items. Insomnia, well, six more items including these. Insomnia, fatigue, anxiety, severe headache, and dizziness. She didn't reveal them until 2015 at an FDA advisory committee meeting. Dr. Bennett, in 2014, before that committee meeting, sent in his citizen's petition where he had 12 items, none of which had been cited before by the FDA or Dr. Boxwell. Six of them were eventually carved out and included in the FDA black box. So what we have is the information in the record provided by the companies did not include the, at least not broken out, not identified in any way that the FDA could say, yeah, you've got these serious problems here. You put them together, you've got a bigger problem. So that is the theory of Dr. Bennett. With regard to the fraudulent inducement, I think the reason why we see so many cases concerning contract is because that's where the False Claims Act cases emerge. It is very simple when you say I am getting a, I have a contract and I got it through fraud and therefore everything else, all the claims are false. But it's been applied to grants. Common law includes instruments and the definition of instrument is pretty broad. The definition of fraud consistently has been construed as extremely broad. So I think Your Honor Judge Phillips has it right. It's reliance. It just happens to be this is a different type of reliance, but the doctrine is still applicable. Thank you, Your Honors. Thank you very much. Any questions?